UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
COCA-COLA NORTH AMERICA, a division of
The Coca-Cola Company, and ODWALLA, INC.,

               Plaintiffs,                          MEMORANDUM
                                               AND ORDER

     -against-

                                               09 CV 3259 (JG)(RML)
CRAWLEY JUICE, INC. and
HOWARD W. CRAWLEY, JR.,

               Defendants.
-----------------------------------------------------------------X
COCA-COLA NORTH AMERICA, a division of
The Coca-Cola Company, and ODWALLA, INC.,

               Plaintiffs,

                                               09 CV 3260 (KAM)(RML)
     -against-

PREMIERE ROUTES, INC., and
LEE REGENBOGEN,

               Defendants.
-----------------------------------------------------------------X
COCA-COLA NORTH AMERICA, a division of
The Coca-Cola Company, and ODWALLA, INC.,

               Plaintiffs,

                                               09 CV 3279 (ERK)(RML)
     -against-

HELLENIC JUICES, INC. and
JOHN LASKARIS,

               Defendants.
-----------------------------------------------------------------X

LEVY, United States Magistrate Judge:

        Plaintiffs Coca-Cola North America and Odwalla, Inc. ("Coca-Cola" or the "Coke

plaintiffs") move to dismiss defendants' counterclaims.  The motion is before me on consent of

the parties.  (See Consent in 09 CV 3259, dated Apr. 23, 2010; Consent in 09 CV 3260, dated Apr. 23, 2010; Consent in 09 CV 3279, dated Apr. 23, 2010.)  I heard oral argument on August 17, 2010 (see Transcript of Oral Argument, dated Aug. 17, 2010 ("Tr.")), after which defendants amended their counterclaims and the parties filed supplemental submissions.  For the reasons stated below, Coca-Cola's motion is granted.

## BACKGROUND AND FACTS

The Coke plaintiffs commenced these three nearly identical actions simultaneously in July 2009, and they have been consolidated for discovery purposes. Defendants Crawley Juice, Inc. ("Crawley"), Premiere Routes, Inc. ("Premiere"), and Hellenic Juices, Inc. ("Hellenic"), and their principals (collectively, "defendants") are former distributers of the Coke plaintiffs' Minute Maid brand fruit juices, juice drinks, and other products. Defendants entered into one-year Distributer Agreements with Coca-Cola, effective August 1, 2007 to July 31, 2008, granting them non-exclusive rights to sell the Coke plaintiffs' products in defined geographic territories in New York and New Jersey.  (See Complaint in 09 CV 3259, dated July 28, 2009 ("Crawley Compl."), Ex. A; Complaint in 09 CV 3260, dated July 28, 2009 ("Premiere Compl."), Ex. A; Complaint in 09 CV 3279, dated July 28, 2009 ("Hellenic Compl."), Ex. A.[1])  In the complaints, the Coke plaintiffs seek monies they claim are due and owing under the Distributor Agreements for products allegedly ordered by and delivered to defendants.  (See Crawley Compl. ¶ 15 (seeking $161,604.88 in damages); Premiere Compl. ¶ 15 (seeking $90,459.25 in damages); Hellenic Compl. ¶ 16 (seeking $494,192.25 in damages).)

---

[1]  For the sake of simplicity, the three identical Distributor Agreements will be cited collectively as "Distributor Agreement."

Defendants' nearly-identical answers deny Coca-Cola's allegations, and defendants claim that they paid in full for the products they ordered and received. (See Answer with Second Amended Counterclaim in 09 CV 3259, dated Sept. 10, 2010 ("Crawley Counterclaim"); Answer with Second Amended Counterclaim in 09 CV 3260, dated Sept. 10, 2010 ("Premiere Counterclaim"); Answer with Second Amended Counterclaim in 09 CV 3279, dated Sept. 10, 2010 ("Hellenic Counterclaim").) Defendants also assert numerous counterclaims, which the Coke plaintiffs now move to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) and failure to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). (See Memorandum of Law in Support of Plaintiffs' Motion to Dismiss Defendants' Counterclaims, dated Apr. 29, 1010 ("Pls.' Mem.").) Those counterclaims seek relief against Coca-Cola for fraud, deceptive business practices, unfair competition, tortious interference with prospective economic advantage, misappropriation of goodwill/unjust enrichment, breach of the covenant of good faith and fair dealing, and misappropriation of inventory/unjust enrichment.[2] (See Crawley Counterclaim ¶¶ 30-73; Premiere Counterclaim ¶¶ 31-73; Hellenic Counterclaim ¶¶ 29-71.)

Specifically, defendants allege that former Coca-Cola employees David Weisberg and Chris Kirby ("Weisberg" and "Kirby") fraudulently induced them to purchase and invest in underdeveloped or vacant territories, in exchange for oral promises of marketing and other support from Coca-Cola, as well as verbal assurances that defendants would be able to extend the Distributor Agreements beyond their one-year terms and ultimately sell the routes once they were

---

[2] Defendants originally asserted but have withdrawn their counterclaims for breach of contract.

fully developed. (Crawley Counterclaim, ¶¶ 2, 11-16, 21; Premiere Counterclaim ¶¶ 2, 11-16, 21; Hellenic Counterclaim ¶¶ 2, 11-16, 21.) Defendants contend that, after they purchased and cultivated the routes in those territories, Coca-Cola threatened them with termination if they refused to purchase excess inventory that they "did not need, did not want, and could ill afford." (Crawley Counterclaim ¶ 22; Premiere Counterclaim ¶ 23; Hellenic Counterclaim ¶ 21.) Defendants also allege that Coca-Cola failed to reimburse them for promised marketing support, hurt their ability to compete in the marketplace by charging them higher prices than a competing distributor for the same products, and failed to properly secure defendants' inventory upon delivery to the warehouse. (Crawley Counterclaim ¶¶ 23-25, 27; Premiere Counterclaim ¶¶ 24-25, 28; Hellenic Counterclaim ¶¶ 22-23, 26.) Finally, defendants claim that on March 16, 2009, Coca-Cola improperly terminated their agreements and granted distribution rights to a competitor, White Rose, Inc. (Crawley Counterclaim ¶ 28; Premiere Counterclaim ¶ 29; Hellenic Counterclaim ¶ 27.)

**DISCUSSION**

A.    Standard for Motion to Dismiss

In considering a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all the facts alleged in the complaint and must liberally construe the complaint in the light most favorable to the plaintiff (or, in this case, the counterclaimants). In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). A complaint should be dismissed only if it fails to set forth sufficient allegations of fact to state a claim for

relief that is "plausible on its face." Id. at 1949; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Facts that assert merely conceivable conclusions will not survive a motion to dismiss. See Twombly, 550 U.S. at 570. Using this standard, I will address each of defendants' counterclaims in turn.

### B. Counterclaim for Fraud

Defendants' first amended counterclaims assert a cause of action for fraud. (See Crawley Counterclaim ¶¶ 30-36; Premiere Counterclaim ¶¶ 31-37; Hellenic Counterclaim ¶¶ 29-35.) Under New York law, a party alleging fraud must state five elements: (i) a material misrepresentation; (ii) made by a defendant knowing that it was false when made; (iii) with the intent to defraud; (iv) upon which plaintiff reasonably relies; and (v) which causes plaintiff injury. See Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (citing Lama Holding Co. v. Smith Barney, Inc., 668 N.E.2d 1370 (N.Y. 1996)). Moreover, under Fed. R. Civ. P. 9(b), allegations of fraud must be pleaded with particularity. The purpose of such specificity is to give the defendant notice of the allegations against it. See Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985).

The Coke plaintiffs argue that defendants' fraud counterclaims are deficient in a number of respects. (See Letter of Thomas J. Goodwin, Esq., dated Oct. 8, 2010 ("Goodwin Ltr."), at 2-7.) First, they point out that the express language of the Distributor Agreements contradicts defendants' allegations concerning Weisberg's and Kirby's oral representations. (Id. at 5; see also Tr. at 9–10.) For example, despite defendants' claims that Weisberg and Kirby promised them "marketing support," including "point of sale" items and free product giveaways (see Crawley Counterclaim ¶ 14; Premiere Counterclaim ¶ 14; Hellenic Counterclaim ¶ 14), there

is no provision in any of the Distributor Agreements for the reimbursement of marketing

expenses.[3]  In addition, although defendants claim that they relied on representations that they

would be able to "sell all or a portion" of their routes after developing them "over many years"

(see Crawley Counterclaim ¶ 13;  Premiere Counterclaim ¶ 13; Hellenic Counterclaim ¶ 13), the

Distributor Agreements (a) were in effect for a specific one-year term, renewable only "for

additional one-year periods upon the mutual written agreement of the parties" (Distributor

Agreement ¶ 2), (b) provide for termination by either party, with or without cause, upon thirty

days' notice (id. ¶ 8(a)), and (c) prohibit defendants from assigning the Distributor Agreement

without Coca-Cola's express, written consent (id. ¶ 9(d)).  The Distributor Agreements also state

explicitly that they "contain the entire and only agreement between the parties respecting the sale

to and the purchase and distribution by the Distributor of the Products" and that "any

representation, promise, or condition in connection therewith not expressly incorporated herein

shall not be binding upon either party."  (Id. ¶ 9(e).)

Defendants do not contend that their Distributor Agreements were invalid  or

unenforceable, and generally, if a contract states that all of the parties' agreements are merged in

the written document, parol evidence is not admissible to vary, or permit escape from, the terms

of the integrated contract.  See Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir.

---

[3]  The only provision in the Distributor Agreements concerning the Coke plaintiffs'
responsibility for marketing states that Coca-Cola "shall provide an Odwalla Distributor manager
who will assist with sampling and marketing events and sales and product handling training of
[Coca-Cola] Products for Distributor."  (Distributor Agreement ¶ 6(b).)  Defendants do not
contend that Coca-Cola breached this term.  It bears noting that another provision states
explicitly that each defendant "exercises control over its own operations, business organization,
management, *marketing plans* and business affairs." (Distributor Agreement ¶ 9(c) (emphasis
added).)

1993) (citing <u>Fogelson v. Rackfay Constr. Co.</u>, 90 N.E.2d 881, 884 (N.Y. 1950)); <u>see also</u> <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 566 N.E.2d 639, 642 (N.Y. 1990) ("When parties set down their agreement in a clear, complete document their writing should as a rule be enforced according to its terms.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or to vary the writing.")  It is true that a general merger clause is ineffective to preclude parol evidence that a party was induced to enter the contract by means of fraud.  <u>Mfrs. Hanover Trust Co.</u>, 7 F.3d at 315 (citing <u>Sabo v. Delman</u>, 143 N.E.2d 906 (N.Y. 1957); <u>Bridger v. Goldsmith</u>, 38 N.E. 458 (N.Y. 1894)); <u>see also</u> <u>Wall v. CSX Transp., Inc.</u>, 471 F.3d 410, 416 (2d Cir. 2006) ("New York . . . permits the use of parol evidence to prove a claim of fraud in the inducement, even where the written contract contains an integration, or merger, clause.").  However, "a claim of fraudulent inducement fails when the alleged misrepresentations conflict with unambiguous terms of the contract at issue."  <u>Gen. Elec. Co. v. Compagnie Euralair, S.A.</u>, 945 F. Supp. 527, 537 (S.D.N.Y. 1996), <u>aff'd</u>, 164 F.3d 617 (2d Cir. 1998); <u>see also</u> <u>Danann Realty Corp. v. Harris</u>, 157 N.E.2d 597, 599 (N.Y. 1959) (specific term of contract "destroy[ed] the allegations" that "agreement was executed in reliance upon . . . contrary oral representations") (citation omitted); <u>Citibank, N.A. v. Plapinger</u>, 485 N.E.2d 974, 977 (N.Y. 1985) (guarantee to bank that was expressly "absolute and unconditional" could not be avoided by claim that guarantee was fraudulently induced through bank's alleged oral promise to supply additional line of credit).

In other words, having signed the Distributor Agreements acknowledging that their contracts could be terminated with or without cause on thirty days' notice, and that any assignment would require Coca-Cola's express, written consent, defendants "cannot now be

heard to assert reliance upon any alleged representations to the contrary." <u>Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.</u>, No. 97 Civ. 4914, 1997 WL 685334, at *3 (S.D.N.Y. Nov. 4, 1997) (Sotomayor, J.), <u>aff'd</u>, 149 F.3d 134 (2d Cir. 1998).

Moreover, defendants' claims concerning Weisberg's and Kirby's promises of "marketing support" do not meet Rule 9(b)'s particularity requirements. The Second Circuit has held that "[t]o satisfy the particularity requirement of 9(b), a complainant must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." <u>Cosmas v. Hassett</u>, 886 F.2d 8, 11 (2d Cir. 1989); <u>see also</u> <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006) (explaining that Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent").

In addition to stating the "where, when, who or how" of the allegedly fraudulent statements, a plaintiff alleging fraudulent inducement must show that the defendant exhibited scienter, or fraudulent intent. Although a party need not plead scienter with great specificity, <u>see</u> Fed. R. Civ. P. 9(b), "there must be some factual basis for conclusory allegations of intent." <u>Ouknine v. MacFarlane</u>, 897 F.2d 75, 80 (2d Cir. 1990). Thus, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995); <u>see also</u> <u>Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano</u>, 331 F. Supp. 2d 247, 253 (S.D.N.Y. 2004). To qualify as "strong" an inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of

other explanations." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007). The requisite "strong inference" of fraud may be satisfied by alleging either (1) facts to show that the defendant had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. <u>Shields v. Citytrust Bancorp. Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994); <u>see also</u> <u>ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009). Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." <u>Novak v. Kasaks</u>, 216 F.3d 300, 307 (2d Cir. 2000) (quoting <u>Shields</u>, 25 F.3d at 1130). Moreover, the benefits of the fraud must accrue to the defendants in "some concrete and personal way." <u>Id.</u>

Here, although defendants allege that Weisberg and Kirby promised "marketing support . . . in the form of paying for such things as marketing expenses, point of sale items, and free product givaways," (Crawley Counterclaim ¶ 14; Premiere Counterclaim ¶ 14; Hellenic Counterclaim ¶ 14), these allegations contain no details as to how much such "support" Weisberg and Kirby promised, monetary or otherwise, or when it was to be forthcoming. Moreover, defendants allege conclusorily that Coca-Cola "never had an intention of honoring these commitments," (Crawley Counterclaim ¶ 31; Premiere Counterclaim ¶ 32; Hellenic Counterclaim ¶ 30), but they do not allege specific facts that give rise to a "strong inference of fraudulent intent." In other words, they do not allege facts that would demonstrate that Weisberg and Kirby had either motive and opportunity or knowledge or reckless disregard sufficient to establish the element of scienter. <u>See</u> <u>Miller v. Holtzbrinck Publishers, LLC</u>, No. 08 Civ. 3508, 2009 WL 528620, at *4 (S.D.N.Y. Mar. 3, 2009) (conclusory allegation of intent was insufficient to

establish element of scienter for fraudulent inducement claim), aff'd, 377 Fed. App'x 72 (2d Cir. May 14, 2010).

Defendants' first counterclaims for fraud are insufficient and are therefore dismissed.

### C.  Counterclaim for Deceptive Business Practices

Defendants' second amended counterclaims assert a cause of action for deceptive business practices.  (See Crawley Counterclaim ¶¶ 37-40; Premiere Counterclaim ¶¶ 38-41; Hellenic Counterclaim ¶¶ 36-39.)  To state a claim for deceptive business practices under New York General Business Law § 349, a claimant must plead: (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way; and (3) that the claimant suffered injury as a result of the deceptive act.  Stutman v. Chem. Bank, 731 N.E.2d 608, 611 (N.Y. 2000); accord Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007); Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000).  A successful claimant can recover both treble damages and attorney's fees.  See N.Y. Gen. Bus. Law § 349(h).

It is undisputed that defendants allege facts that satisfy the second and third elements of a deceptive business practices claim.  (See Pls.' Mem. at 11-15 (focusing exclusively on the first element).)  Thus, whether defendants' counterclaim for deceptive business practices survives turns on the degree to which Coca Cola's alleged misrepresentations were "consumer-oriented."  To be "consumer-oriented," a deceptive act or practice must have "'a broader impact on consumers at large.'"  Gaidon v. Guardian Life Ins. Co., 725 N.E.2d 598, 603 (N.Y. 1999) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 647 N.E.2d 741, 744 (N.Y. 1995)); see also Genesco Entm't v. Koch, 593 F. Supp. 743, 752 (S.D.N.Y. 1984)

(interpreting § 349 as excluding from its coverage "[p]rivate transactions not of a recurring nature or without ramification for the public at large. . . ."); Quail Ridge Assocs. v. Chem. Bank, 558 N.Y.S.2d 655, 658 (3d Dep't 1990) (concluding that "a commercial transaction of the 'single shot' type" is "outside the scope of General Business Law § 349(a).") (citation omitted). Although § 349 may encompass a dispute between businesses,[4] such a dispute must also cause some harm to the public, as the "'gravaman of the [deceptive trade practices] complaint must be consumer injury or harm to the public interest.'" Procter & Gamble Co. v. Quality King Distribs., Inc., 974 F. Supp. 190, 201 (E.D.N.Y. 1997) (quoting Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995)).

Here, defendants' counterclaims do not allege that Coca-Cola's acts affected the public or were aimed at consumers generally. Notwithstanding their conclusory assertion that Coca-Cola's actions "were consumer oriented because they had ramifications and an affect [sic] on the end-user of the products, namely the public at large" (Crawley Counterclaim ¶ 39; Premiere Counterclaim ¶ 40; Hellenic Counterclaim ¶ 38), the counterclaims allege no specific facts to support that claim. See Iqbal, 129 S. Ct. at 1949 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") Therefore, defendants do not state a claim under § 349, and this counterclaim is dismissed.

---

[4] See Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 304 (E.D.N.Y 2010) (explaining that "though businesses may sometimes bring § 349 claims, they may do so only where the defendant's deceptive conduct is, at least to some extent, directed at non-business consumers.")

D.  Counterclaim for Unfair Competition

Defendants' third counterclaims are for unfair competition.  Under New York law, the essence of an unfair competition claim is that "the defendant has misappropriated the labors and expenditures of another" and has done so in bad faith.  <u>Saratoga Vichy Spring Co. v. Lehman</u>, 625 F.2d 1037, 1044 (2d Cir. 1980); <u>see also</u> <u>CA, Inc. v. Simple.com, Inc.</u>, 621 F. Supp. 2d 45, 52 (E.D.N.Y. 2009) (explaining that, although the tort of unfair competition is a broad doctrine, a claimant must show more than commercial unfairness); <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002) (stating that "[t]he central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another" and that "[a]n unfair competition claim must also involve some degree of bad faith.").  In addition, a claim for unfair competition under New York law must allege special damages such as "direct financial loss, lost dealings, or an accounting of the profits" resulting from the "anticompetitive" acts at issue.  <u>CA, Inc.</u>, 621 F. Supp. 2d at 52.

The unfair competition claim in New York is "a broad and flexible doctrine" that has been described as "any form of commercial immorality."  <u>Roy Exp. Co. Establishment v. Columbia Broad. Sys.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982) (also stating that the tort of unfair competition "is adaptable and capricious.").  Nonetheless, "[n]ot every act, even if taken in bad faith, constitutes unfair competition."  <u>CA, Inc.</u>, 621 F. Supp. 2d at 53; <u>see also</u> <u>Laser Diode Array, Inc. v. Paradigm Lasers, Inc.</u>, 964 F. Supp. 90, 95 (W.D.N.Y. 1997) (explaining that "[t]he tort is not all-encompassing" and noting that "the New York Court of Appeals, rejecting the notion that unfair competition is equivalent to the amorphous term 'commercial unfairness' has stated that 'misappropriation of another's commercial advantage is a cornerstone of the tort.'"

(quoting Ruder & Finn Inc. v. Seaboard Sur. Co., 422 N.E.2d 518 (1981))).

Defendants allege that Coca-Cola used its "significant economic power and control over the marketplace" and "violated the morality of the marketplace" with "malicious motive" by:

> (a) dumping product; (b) threatening termination if [defendants] did not accept unordered product and if it continued to complain about the situation; (c) misappropriating inventory belonging to [defendants]; (d) misrepresenting that Coca-Cola would provide [defendants] with the necessary marketing support in [their territories]; (e) and [engaging in] price discrimination by selling product to White Rose for a cheaper price.

(Crawley Counterclaim ¶¶ 46-47; Premiere Counterclaim ¶¶ 45-47; Hellenic Counterclaim ¶¶ 44-46.)  Although these allegations do aver commercially unfair conduct, defendants' unfair competition claims fail due to the absence of any allegation that Coca-Cola misappropriated defendants' labors, skills, expenditures, goodwill or other property right of commercial value.  As plaintiff correctly observes, Coca-Cola was never defendants' competitor.[5]  (See Goodwin Ltr. at 7.)  Rather, under the parties' non-exclusive contracts, Coca-Cola was the seller and defendants were the buyers and distributors of plaintiffs' products.  Defendants have cited no case, and this court is aware of none, sustaining an unfair competition claim in the context of a similar seller-buyer or seller-distributor relationship.

As numerous courts have noted, the scope of the unfair competition action is

---

[5]  At oral argument, defendants cited a trademark infringement case for the proposition that "'[u]nder New York law, a party need not be a direct competitor to institute an unfair competition action.'"  (Tr. at 22 (quoting Berni v. Int'l Gourmet Rests. of Am., Inc., 838 F.2d 642, 648 (2d Cir. 1988).)  The court in Berni held that a possessor of a trade secret need only have "a colorable property or pecuniary interest" in the intellectual property at issue to state a claim for unfair competition.  Id. (dismissing unfair competition claim by former shareholders on the ground that they did not plead facts supporting a colorable property or pecuniary interest in the trademark at issue).  The instant case does not involve trademarks, trade secrets, or intellectual property of any kind.  Berni is therefore inapplicable.

generally limited to three categories: "'passing off one's goods as those of another, engaging in activities solely to destroy a rival[,] and using methods themselves independently illegal.'" Paper Corp. of U.S. v. Schoeller Technical Papers, Inc., 759 F. Supp. 1039, 1046 (S.D.N.Y. 1991) (quoting Ray v. Proxmire, 581 F.2d 998, 1002 (D.C. Cir. 1978)). See also Berlitz Schs. of Languages of Am., Inc. v. Everest House, 619 F.2d 211, 215 (2d Cir. 1980) (explaining that the "sine qua non" of an unfair competition action is the likelihood of confusion between the plaintiff's and defendant's products); Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., 515 F. Supp. 2d 298, 311 (N.D.N.Y. 2007) ("Under New York law, . . . [an] unfair competition claim, 'usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's use of the same property.'" (quoting Roy Exp. Co., 672 F.2d at 1105)); Kwan v. Schlein, 441 F. Supp. 2d 491, 502 (S.D.N.Y. 2006) (stating that "[c]laims for unfair competition under New York law typically fall into one of two categories: passing off, or malicious or fraudulent interference with good will.") (citing cases). Defendants make no claim of marketplace confusion, they were never Coca-Cola's rivals, and they allege no independently illegal conduct. Accordingly, their counterclaim for unfair competition is dismissed.

E.  Counterclaim for Tortious Interference with Prospective Business Advantage

Defendants' fourth claims for relief assert a cause of action for tortious interference with prospective business advantage. Defendants allege that Coca-Cola interfered with their relationships with their customers "intentionally, maliciously, willfully and without justification." (Crawley Counterclaim ¶ 54; Premiere Counterclaim ¶ 54; Hellenic Counterclaim ¶ 53.) To state a claim for this tort under New York law, "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3)

the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008); see Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004) (finding no tortious interference with prospective economic relations because franchiser's decision to sell ice cream in grocery stores for its own economic advantage did not unlawfully interfere with the relationships between its franchisees and their customers); Alexander & Alexander of N.Y., Inc. v. Fritzen, 503 N.E.2d 102, 103 (N.Y. 1986) (stating that a claim for tortious interference with prospective economic advantage must allege that the defendant interfered in the business relationship of the plaintiff and a third party and "used improper means or acted solely for the purpose of injuring plaintiff"). The third element, the "wrongful or improper means" requirement, is "demanding because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the 'competing interest of the [alleged] interferer,' . . . as well as the broader policy of fostering healthy competition." Catskill Dev., 547 F.3d at 132 (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 449 (N.Y. 1980), and citing NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 664 N.E.2d 492, 497 (N.Y. 1996)). Terminating a distribution agreement does not meet this standard. See Innomed Labs, LLC. v. Alza Corp., No. 02-9491, 2004 WL 1078136, at *3 (2d Cir. May 14, 2004) (stating that manufacturer's termination of agreement with distributor could not constitute the wrongful act necessary to establish a claim for tortious interference with prospective economic advantage).

Other than alleging conclusorily that Coca-Cola "intentionally, maliciously, willfully and without justification" interfered in defendants' relationships with their customers,

defendants' pleadings are silent as to the wrongful or improper means Coca-Cola allegedly employed. Clearly, it was not wrongful or improper for Coca-Cola to terminate the Distributor Agreements, as they were contractually permitted to do so without cause on thirty days' notice. Defendants' counterclaims for tortious interference with prospective business advantage are therefore dismissed.

      F.  <u>Counterclaim for Misappropriation of Goodwill</u>

      Defendants' fifth claims for relief assert a cause of action for misappropriation of goodwill. They allege that by terminating their distribution rights without cause, "Coca-Cola has illegally misappropriated [defendants'] goodwill . . . without the payment of any compensation to [defendants.]" (Crawley Counterclaim ¶ 61; Premiere Counterclaim ¶ 60; Hellenic Counterclaim ¶ 60.) To establish a claim of misappropriation of goodwill under New York law, the claimant must allege facts to prove the "misappropriation of the skill, expenditures, and labors of another," where "such skill, expenditures, and labor may consist of tangible products, or intangible property such as goodwill developed in a particular trade name or mark." <u>Am. Footwear Corp. v. Gen. Footwear Co.</u>, 609 F.2d 655, 662 (2d Cir. 1979); <u>see also</u> <u>Defiance Button Mach. Co. v. C & C Metal Prods. Corp.</u>, 759 F.2d 1053, 1061 (2d Cir. 1985) (finding misappropriation of goodwill where defendant misappropriated plaintiff's "mark" by capitalizing on plaintiff's name, letterhead and unique logo without authorization); <u>Diversified Mktg., Inc. v. Estee Lauder, Inc.</u>, 705 F. Supp. 128, 132 (S.D.N.Y. 1988) ("Misappropriation of goodwill under New York law is the 'misleading of the public into believing that a product is sponsored or derived from another.'" (citing <u>Am. Footwear Corp.</u>, 609 F.2d at 662)).

      The intangible "market" that defendants allegedly invested in and developed for

sales of Coca-Cola's juice products is not the trade name or trademark characteristic of a misappropriation of goodwill claim. Rather, in this counterclaim, defendants allege that Coca-Cola misappropriated the "goodwill established by [defendants] and the investment of time and money by [defendants] in creating the market for Coca-Cola products in the [defendants'] Territor[ies]." (Crawley Counterclaim ¶ 59; Premiere Counterclaim ¶ 59; Hellenic Counterclaim ¶ 58.) Goodwill is not easily defined, but it has been described as the "expectation that the old customers will resort to the old place." United States v. All Assets of Statewide Auto Parts, Inc., 971 F.2d 896, 901 (2d Cir. 1992) (quoting Commissioner v. Killian, 314 F.2d 852, 855 (5th Cir. 1963), quoting Crotwell v. Lye, 34 Eng. Rep. 129, 134 (1810)). It typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business. See Mutual Life Ins. Co. v. Menin, 115 F.2d 975, 977 (2d Cir. 1940); see also Newark Morning Ledger Co. v. United States, 507 U.S. 546, 555-56 (1993) ("Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage,' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to [a] business." (internal citation omitted)); General Cigar Co., Inc. v. G.D.M. Inc., 988 F. Supp. 647, 659 (S.D.N.Y. 1997) ("Good will has been defined as 'the value attributable to a going concern apart from its physical assets—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company.'" (quoting Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994))).

   The Distributor Agreements clearly contemplate the creation of this kind of goodwill, namely the distributors' cultivation of relationships with specific retailers. As Coca-

Cola points out, the Distributor Agreements state explicitly that "[a]ny goodwill accruing from the sale, promotion and distribution of Products within the Territory shall accrue to [Coca-Cola] only." (Distributor Agreement ¶ 4(g) (emphasis added).) Moreover, as explained, the Distributor Agreements were effective for a renewable one-year term and could be terminated without cause on thirty days' notice. (Id. ¶¶ 2, 8(a).) Plus, the agreements were non-exclusive, meaning that Coca-Cola had the right "to sell Products directly or indirectly through broad-line distributors and any other distributor of [Coca-Cola] to any Account in the Territor[ies.]" (Id. ¶ 3(f).) In light of these contractual provisions, defendants cannot claim that Coca-Cola misappropriated any goodwill they may have generated. See Gidatex, S.R.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) (dismissing former distributor's counterclaim for misappropriation of goodwill on the ground that it "boil[ed] down to a transparent attempt to insulate itself from the rigors of marketplace competition" and explaining that seeking to compete in a market that may have developed pursuant to another's efforts "is not prohibited by law" unless it is "accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." (citing cases)). Accordingly, this counterclaim is dismissed.

      G.  Counterclaim for Breach of the Covenant of Good Faith and Fair Dealing

        Defendants' sixth claims for relief assert a cause of action for breach of the implied covenant of good faith and fair dealing. Defendants allege that Coca-Cola breached this covenant by:

> (a) dumping product; (b) threatening termination if [defendants] did not accept unordered product; (c) misappropriating inventory; (d) misrepresenting that Coca-Cola would provide [defendants] with the necessary marketing support in [defendants'] Territor[ies]; (e)

and [engaging in] price discrimination.

(Crawley Counterclaim ¶ 66; Premiere Counterclaim ¶ 66; Hellenic Counterclaim ¶ 65.)

An implied covenant of good faith and fair dealing inheres in every New York contract.  See Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995); Rowe v. Great Atl. & Pac. Tea Co., 385 N.E.2d 566, 569 (N.Y. 1978).  The scope of potential liability for breach of the covenant is quite narrow: such a breach cannot give rise to liability if it merely replicates the liability for breach of the underlying contract, see Apfel v. Prudential-Bache Secs., Inc., 583 N.Y.S.2d 386, 387 (1st Dep't 1992), nor can it create new contractual rights or impose additional duties.  Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y. 1983); see also Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (explaining that the implied covenant of good faith and fair dealing "can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties." (citation omitted)); Metro. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989) (refusing to "permit an implied covenant to shoehorn into [a contract] additional terms plaintiffs now wish had been included.").  Instead, breach of the covenant of good faith and fair dealing occurs "where the contract is not technically breached, but one party has acted to destroy or injure the right of the other party to receive the benefit of the contract."  Witherspoon v. Rappaport, 65 Fed. App'x 356, 359, 2003 WL 21105394, at *2 (2d Cir. 2003); see also CSI Inv. Partners II, L.P. v. Cendant Corp., 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) ("A claim for breach of the covenant of good faith and fair dealing 'may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract

in a technical sense, nonetheless deprived the other party of the benefit of its bargain.'" (quoting Sauer v. Xerox Corp., 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000))), aff'd, 328 Fed. Appx. 56 (2d Cir. 2009).

Crucially, New York law does not recognize a claim for breach of an implied covenant of good faith and fair dealing in "at-will" distribution contracts like the one at issue here. See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) ("Reading an implied duty of good faith and fair dealing into the [parties' distribution agreement] would . . . , in essence, cut against the terminable nature of the [agreement], in direct contravention of the [agreement's] unambiguous language.")

Here, the Distributor Agreements do not impose any affirmative duty on Coca-Cola other than to sell ordered juice products to defendants for distribution to retail stores.[6] (See Distributor Agreement ¶ 6 (entitled "CCNA and Odwalla Duties").) Any attempt to read other duties into the Distributor Agreements would create new, unbargained-for obligations that extend well past any implied duty of good faith and fair dealing. Accordingly, this claim is dismissed.

H. Counterclaim for Misappropriation of Inventory/Unjust Enrichment

Defendants' final counterclaims are for unjust enrichment due to misappropriated inventory. (See Crawley Counterclaim ¶¶ 69-73; Premiere Counterclaim ¶¶ 69-73; Hellenic Counterclaim ¶¶ 68-71.) Indeed, throughout their amended counterclaims, defendants allege that

---

[6] As Coca-Cola points out, the Distributor Agreements specifically address the situation where a distributor receives more or less inventory than it ordered. (See Distributor Agreement ¶¶ 3(h), 3(i), 6(c).) The procedure requires the distributor to notify Coca-Cola of the discrepancy in writing within five business days. (Id. ¶ 3(i).) Defendants do not allege that they followed this procedure.

Coca-Cola "misappropriated inventory" that belonged to them or "dumped" inventory on them. (See, e.g., Crawley Counterclaim ¶¶ 22, 25, 38, 45, 66, 70, 71; Premiere Counterclaim ¶¶ 23, 26, 39, 46, 66, 70, 71; Hellenic Counterclaim ¶¶ 21, 24, 37, 44, 65, 69, 70.) To plead a claim for unjust enrichment, the claimant must allege facts to show that: (1) the defendant was enriched; (2) at plaintiff's expense; and (3) equity and good conscience require restitution. See Lake Minnewaska Mountain Houses Inc. v. Rekis, 686 N.Y.S.2d 186, 187 (3d Dep't 1999); see also Segal v. Cooper, 856 N.Y.S.2d 12, 13 (1st Dep't 2008) (finding claim for unjust enrichment sufficient where plaintiff alleged he was denied rightful commissions after he marketed a business venture he entered into with defendants).

Defendants' counterclaims contain no detail whatsoever as to what "inventory" Coca-Cola allegedly misappropriated or when, other than to state that defendants have been damaged "in an amount to be determined at trial, but no less than" $50,000 for Crawley and Hellenic and $30,000 for Premiere. (Crawley Counterclaim ¶ 73; Premiere Counterclaim ¶ 73; Hellenic Counterclaim ¶ 71.) Nor do the counterclaims offer any specificity as to how much "unordered and excess" inventory Coca-Cola allegedly "dumped" by "forcing" defendants to purchase items they did not want. (See Crawley Counterclaim ¶ 22; Premiere Counterclaim ¶ 23; Hellenic Counterclaim ¶ 21.) These claims do not contain sufficient factual allegations to render them plausible under Iqbal, 129 S. Ct. at 1949.

Moreover, "'[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.'" Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 586–87 (2d Cir. 2006) (quoting

Goldman v. Met. Life Ins. Co., 841 N.E.2d 742 (N.Y. 2005)).  As the New York Court of Appeals

has explained:

> The existence of a valid and enforceable written contract governing
> a particular subject matter ordinarily precludes recovery in quasi
> contract for events arising out of the same subject matter.  A "quasi
> contract" only applies in the absence of an express agreement, and
> is not really a contract at all, but rather a legal obligation imposed in
> order to prevent a party's unjust enrichment. . . . Briefly stated, a
> quasi-contractual obligation is one imposed by law where there has
> been no agreement or expression of assent, by word or act, on the
> part of either party involved . . . .

Id. (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987)

(internal citations omitted)).  In other words, "'[i]t is impermissible . . . to seek damages in an

action sounding in quasi contract where the suing party has fully performed on a valid written

agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute

between the parties.'"  Id. (quoting Clark-Fitzpatrick, Inc., 516 N.E.2d at 193); see also CDO Plus

Master Fund Ltd. v. Wachovia Bank, N.A., No. 07-CV-11078, 2009 WL 2033048, at *8

(S.D.N.Y. July 13, 2009) (dismissing unjust enrichment claim based upon existence of written

contract between the parties); accord Atlantis Info. Tech., GmbH v. CA, Inc., 485 F. Supp. 2d

224, 234 (E.D.N.Y. 2007).

      Here, the Distributor Agreements—which defendants do not deny were valid and

enforceable written agreements—clearly govern the parties' dispute over inventory.  Specifically,

the Distributor Agreements state that Coca-Cola "shall promptly adjust any invoice if any

Products shipped to Distributor are in error as evidenced by Distributor's recording of such mis-

shipment directly on the invoice at the time of delivery."  (Distributor Agreement ¶ 6(c).)  The

Distributor Agreements also give defendants the responsibility to notify Coca-Cola in writing of any discrepancies between defendants' orders and the products actually received.  (See id. ¶¶ 3(h), 3(i).)  Defendants do not claim to have complied with these terms, and they do not accuse Coca-Cola of breaching them.  Because "the valid and enforceable written [contracts] govern[ ] the particular subject matter of this case," Beth Israel Med. Ctr., 448 F.3d at 586, defendants' counterclaims for unjust enrichment are dismissed.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to dismiss defendants' counterclaims is granted.

SO ORDERED.

_____
/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
     May 17, 2011